Ladies and gentlemen, we'll proceed to our third case, number 12-4319, United States v. John Franklin. Ms. Wicks, we'll be glad to hear from you, ma'am. Good morning, Your Honors. May it please the Court, on behalf of Mr. Franklin, I'd like to address the sufficiency of the evidence argument. And looking back again, if the Court even looks at the government's closing argument, the argument that was made, that was relied upon by the government, was that the possession of the gun during either of the charged carjackings was with the intent to frighten. And under the Supreme Court Holloway case, and the subsequent case law cited in our briefs, that's simply not sufficient under the statute, the federal carjacking statute. In this case, for both the first incident and the second incident, while there was a gun during part of the sequence of events, in either point during a certain part of the incident, there was arguably a brandishing of the firearm. But under the Holloway case, that's not sufficient under the statute for this specific intent under, for the carjacking. And I would just point the case to the Court, to the other cases that we cite, that all stand for the proposition that not only must there be a nexus between the use of the gun and the taking of the car, but there also must be something more than the brandishing of a firearm. And in this case, before the Court, there simply is not that evidence. What more beyond brandishing is needed? That the brandishing of the firearm is not merely enough, that basically the Court says that could be an empty threat or an intimidating bluff. And so the Court looks to other facts elucidated at the trial. If there was other assaultive conduct by the defendants, if there were threats made in conjunction with the use of the gun. This was different, because in the first case, there was the gun held to the ribs of the driver. And in the second case, wasn't the gun touching the chest of one of the women in the evidence? And that's a little more than just brandishing. Brandishing, to my mind, is presentation or waving, generally. And I agree, the problem is the nexus with the request for the gun, for the car. And in the first incident, there's actually not, there's arguably, there's what unfolds, but there's no specific request until it's basically, we're going to borrow your car, I have your license, and we know where you live, and we'll bring it back. And at that point, there isn't testimony. I mean, there was, the complainant observed the man in the backseat that had a gun pointed at him. But in terms of, there's a period of time that elapses, because he's describing what occurred, that the front seat passenger went through his pockets and took out stuff, and there's a discussion about his license, and then either Mr. Franklin or one of the other co-defendants, depending on what day it is, the complainant says, one of them at least took his license, and that Mr. Franklin is talking about the license. So in terms of the nexus between the gun and essentially the request for the car, I guess we'll call it politely, I think there's a time differential there. And so at the time when Mr. Franklin is apparently telling him, we're going to take your car, but we're going to bring it back, that certainly doesn't insinuate to him, and if you don't give it to us, we're going to kill you. When he's basically insinuating, we're going to bring it back to you. If he was insinuating we're going to kill you, it doesn't matter if they know who he is or not. If they're insinuating we're just going to kill you, he's saying don't call the police because we're going to bring the car back, not that we're going to do anything further to harm you. In the second incident, the testimony, and specifically, there's the testimony from Ms. Ward, who's the person that said, the person that she identified as Mr. Williams, had held the gun to her chest. That is at the very beginning of the episode. They've stepped out of the car, and the man comes up to her and points the gun at her, and according to her, has it on her chest. Clearly, Mr. Williams disagrees with that. But assuming that the jury credited that, there's then a whole series of activities that occur before that same person says to her, give me your keys. And there's no evidence that the gun was even brandished at that point to Ms. Ward, when he asked for the keys and she gives him the keys. And her testimony about being scared had to do really with the beginning of the episode outside of the car, when her other personal possessions are being taken. And so I think there's a fine line, but the line that's drawn by the Supreme Court in Holloway, and the subsequent Quays law in this circuit and in other circuits, is that there must be something in addition to a brandishing of the firearm at the point that someone's asking for the gun, under the federal carjacking statute. Well, from whose point of view do we make that determination? The man that's got the gun or the woman with the gun being pointed at? It's objective, Your Honor, and I think it's... The case law is clear that it's not subjective to what the complainant or victim was thinking, but in terms of objectively, what is the person doing? And if you look at all of the cases, particularly in this circuit, Foster and Valeos and Adams, which is the Sixth Circuit case, but that there's the physical touching at the point of asking for the car with the firearm, or if there's not a physical touching with the gun, that there's other assaultive behavior done in conjunction with the request for the vehicle or the demanding of the vehicle or the keys to the vehicle. And that's simply not here in this case. The other issue that I would point to is, also in closing argument, the government even itself said that there are three different theories of Mr. Franklin's possession of a firearm by a convicted felon. And I think the problem is we don't know what the jury... We don't know which theory the jury convicted him of. And given the case law in other circuits, if the jury didn't convict him of actual possession, then there is a legal problem. And I think that the evidence was not sufficient for the jury to find him in actual possession of the firearm after the bailout at the car. It was the complainant, I think it was Ms. Green, said that it was Mr. Williams that was closer to where the gun was. And I think it's speculating to say, oh, well, it couldn't have been Mr. Williams that dropped the gun, that it must have been Mr. Franklin. I think that's speculation at best. And the other two theories would be either that Mr. Franklin is basically possessing it through an alleged conspiratorial or aiding and abetting theory for Mr. Frazier or Mr. Williams. And the problem is, is that I think under the other circuit's case law, that that's insufficient for a felon in possession to meet the elements of felon in possession. And just for a moment to talk about the ineffective claim. And I think the government brings up the point that there was a criminal history done earlier in the case prior to trial. And I think the problem with that is, first of all, the criminal history that was done, the government itself disagrees with, which it found that Mr. Franklin was an armed career criminal. So I think the record is clear that if that was the information they did to Mr. Franklin, he was not given the correct information about what his exposure was. And specifically, the government even raises, well, defendants are told what the maximum is that they're facing. And while that's maybe true, Mr. Franklin was not told that he was facing a mandatory seven years on one count with a consecutive mandatory 25 years on another count. That was not what was told to him. He was actually told that each count was just a mandatory seven and not that they had to be consecutive to each other. So I think the record is actually clear that Mr. Franklin, on the record, was given misinformation about his exposure. And clearly, after trial, tells the court, I wasn't told what I would be facing if I was convicted at trial. The court didn't deal with that. I think the court should have dealt with that. And since Mr. Franklin is on appeal, that's why we're asking for the case to be remanded, for the court to deal with that issue. And if the court doesn't have any additional questions, I would reserve the rest of my time in rebuttal. Thank you very much, Ms. Swift. Thank you. Mr. Sipple, good morning. Good morning, Your Honor. Good morning. May it please the court. Your Honors, the government introduced more than substantial evidence to support the jury's finding that Defendant Franklin was a member of a conspiracy that committed two carjackings in this case. I'm not going to belabor the court with every detail of the facts. It's in the record. But essentially, what happened that night were three men, Defendant Franklin, Troy Williams, and Dwayne Frazier, all decided to go to downtown Baltimore to rob persons. Mr. Williams, who, in the middle of trial, came forth and said that he wanted to cooperate, testified at trial, said that when they left the residence of Mr. Frazier, that he knew Frazier had a gun. It was actually Mr. Franklin's idea to go downtown and rob people, because I believe it was a Saturday night, either Friday or Saturday night, and Mr. Franklin said, hey, there would be money downtown. Let's go get some. Thereafter, the court's aware the first carjacking victim, Sean Gallion Thomas, as Your Honor pointed out, had the firearm put in his ribcage. Mr. Franklin took his license from his pocket and read it to him, which the victim perceived as a threat. That might not mean much in other parts, but in Baltimore City, if you have a gun pointed in your ribcage and someone holds your license and reads your name and reads your address, that's a pretty serious threat. And I think it's reasonable for the jury to infer that these defendants, with a fully loaded .357 firearm, would have taken some sort of action had Mr. Gallion Thomas not relinquished his vehicle to him. With all due respect to the defense's argument, the intent requirement is not such that you have to actually prove the actual intent of the defendant. That would be impossible. How could you ever prove the actual intent of a defendant in a trial if the defendant never testified or you had some sort of psychological or psychiatric testimony that would perhaps shed light on it? So what the Supreme Court has said is that the government doesn't have to prove the actual intent, but all that's necessary and sufficient is for the government to show that the defendant was conditionally prepared to act if the person or carjacking victim failed to relinquish the vehicle. And in this case, your honors, that evidence is more than sufficient for the jury to make that reasonable inference that the three men who got into the first vehicle, pointed the firearm in the ribcage of the victim, threatened him by reading his name and address, and then forcing him out of his vehicle. There's nonsense about returning the vehicle. There's no evidence that there's ever any intent to return that vehicle. If they were going to return the vehicle, why did they kick him out of the car? And then why did they use a loaded firearm to convince him to let them use their vehicle? If he was going to return the vehicle, remember this all started out as an illegal cab on a hack, hack ride. He was going to take them wherever they wanted to go to earn some money to put gas in his car. It doesn't make sense if you believe the defense's version of the facts. The three men, having control of the first vehicle, drive a short distance to the location where the second carjacking occurred. They used the firearm again, and actually they used the vehicle as a weapon to speak, by blocking in the three victims so they couldn't leave the parking lot. Two men, Frank Williams, get out of the vehicle. Williams has the firearm this time, points the firearm right in Ms. Ward's chest. That was her testimony. And your honors, her testimony at trial was that she believed that she was going to be shot and killed if she didn't do everything those men asked her to do that night. If that's not evidence for the jury to infer that these men would have caused serious bodily injury or death, I don't know what is. And again, your honors, the case law from the circuit supports the proposition that really a firearm is all that's necessary. The Norfleet case, the Granger case, the other cases cited in the government's brief support the proposition that a firearm, and in this case, a fully loaded firearm, coupled with the other actions in this case, such as threats. And Mr. Franklin actually manhandled the one victim, if you will, dug in her pockets, kind of shoved her around. Those are actions that corroborate an intent to cause serious bodily harm or death. And it was very reasonable for the jury in this case to make that determination. Turning now to the 922G count, the evidence was certainly sufficient to support the jury's verdict as to actual possession. Now, defense counsel makes a lot of arguments about what government counsel argued at closing arguments, panels aware. What lawyers say in opening and closing arguments is not evidence. What's evidence is what the victims, the witnesses, the police officers, that's the evidence in the case. And in this case, what you heard was Mr. Williams, who testified at trial, testified that when the car crashed, both men bailed out. Mr. Williams was asked specific questions about the sequence of events that happened thereafter. He specifically stated, testified at trial, that he did not grab the firearm when he exited the vehicle. In fact, he was found, imagine the block in this case is almost a perfect rectangle. The car crashed in the northeast corner of the rectangle. Mr. Williams was found 20, 30 feet away, also in the northeast corner, but on the east side of the block. The firearm was located in the northwest corner of the block on the west side. And then Mr. Franklin was located on the southwest corner of the block, walking away from where the firearm was located. Does the record show how many feet the firearm, or how many yards the firearm was from Mr. Franklin? Your Honor, yes, there was a map, and in hindsight, Your Honor, I realized that I probably secluded the map that was introduced as evidence at trial as part of my supplemental joint appendix, or the government supplemental joint appendix. But it was just 50 feet away. I don't wanna- Is that in the record? Your Honor, I don't know if it's actual- It's kind of unclear to me reading this. I thought that was perhaps the government's weakest point. Yeah, the actual feet, I don't know, is actually in the record. But Your Honor, what the testimony also showed is that when the police came to the scene, they came along that north side of the block. So it would not have been reasonable, or perhaps maybe would have, but for Williams to have ran over toward the northeast or northwest corner of the block, drop the gun, and then circle back around to the northeast corner and hide on. I mean, he literally would have had to transverse almost half of the block. And the police arrived, I mean, they were literally seconds behind. So in terms of the temporal proximity, it doesn't make sense. Mr. Franklin- Was it tied strictly on an actual possession theory? Excuse me, Your Honor? Was the handgun count tied only on an actual possession theory? Your Honor, it was charged on an actual, and there was also an aiding and abetting. Wouldn't that be enough? It would be enough, Your Honor. But in this case, the government argues that- And he was in the car with the gun. He was, but- And the other evidence shows, I would think, shows joint or constructive possession. You're absolutely right, Your Honor. In this case, we're kind of fortunate because- Was the jury instructed on joint actual constructive possession? So they could have found any one of those, or they could have rejected those, but they didn't, Your Honor. They found him guilty of that count, because I believe it was reasonable to infer that as Mr. Franklin cornered that block, that he tossed the gun down into the stairwell and then was caught just a little further down the block. I think it was certainly reasonable for the jury to infer, based on Mr. Williams' testimony, that he didn't grab the gun. At that point, Mr. Williams has nothing to lose. He's sitting on the sand telling what happened. The jury could accept his testimony, reject his testimony, and his testimony was he didn't grab the gun. Well, there's only two people in the car, so if he didn't grab the gun, it was certainly reasonable for the jury to infer that Mr. Franklin did grab the gun, which means he would have been in actual possession of that firearm. Your Honors, as to the ineffective assistance claim, as stated in the government brief, there simply is not enough evidence to draw a conclusion as to whether Mr. Franklin's counsel was ineffective or not as to the advisement of the maximum sentence that he would face had he proceeded the trial, and he did proceed the trial. In this case- Did the magistrate judge do that at the arraignment? Your Honor, I- You don't have the transcript? I don't, Your Honor, and I can't recall, but as you're aware, that it is the procedure in Maryland that the magistrate judge does read the maximum sentence- I think in every federal court. Right, I didn't feel comfortable speaking to every federal court, Your Honor, but I did know, at least in Maryland, as you're familiar, that the magistrate judges do read the maximum penalties to defendants and- And in any event, we haven't heard from defense counsel here as to what- Right, and Mr. Franklin had two sets of defense counsel. He had a member of the public defender's office initially, and then a panel attorney, who were both competent counsel. So, it submits that, to be fair, at least their side of the story should be heard for this court, or for any court, to decide whether or not their actions were ineffective or not. And I don't think this court has enough information before it to make a conclusion as to whether or not Mr. Franklin's counsel were ineffective or not. And again, turning to the last argument that the defense looks at, or raises, in terms of the suppression motions, the big issue is the identifications. And I want to address that with the court, because- Actually, counsel didn't address that in her opening argument. And that's why I'll be brief, but this was a very, very unique situation, a very fortunate situation, where there just happened to be Baltimore City police officers, kind of right place, right time, where they were able to quickly act and quickly set up a perimeter. And in this case, it just made sense, where they have a perimeter established, and they find two people that match the descriptions to bring the victims to the scene to identify them. How long after did that occur? Roughly a half hour, Your Honor. So in terms of the criminal investigation world, that's pretty quick. In fact, that's real quick. Did they have to say, we found them? The officer who testified, the officer Ali who transported the three female victims to the scene, was very careful in his testimony and how he presented it. He just said, they've arrested two men, and we're going to take you to the scene. He didn't say, we've got them, or these are the guys. He just drove them to the scene, made sure they were okay, and then when they got to the scene, took them. And the girls, without hesitation, identified both Franklin and again, this is in hindsight, I should have attached the booking photo for Mr. Franklin to show the very colorful, loud shirt that he was wearing that night. Where was the car when this happened? The red Dodge Charger? Yes. It was at the, again, it was stayed at the northeast corner of the block. And it was their car? It was their car. Could they see the car at the time they made the, at the time of the show up? You don't know. You know, Your Honor, I do not know the answer to that question. I do not know the answer to that question. But in this case, as the- I mean, you have to agree, I think, that that would have been pretty suggestive. Right? I mean, if you stand the guys in front of their car. I mean, that's an argument, Your Honor. I don't disagree with that. I'm not saying it's unnecessarily suggestive, but you know, they would have recognized the car. But as this court has said in the Smith versus Coyner case, it was decided a long time ago in 1973. But in this situation where you have a crime committed, and the police have a description of the suspects, and the show up is completed under circumstances where it's important to continue the search for the real culprit. But I thought, didn't Shenise Ward testify that the officer said they found them? She- Isn't that her testimony, 303 of the appendix? She may have, Your Honor. Okay, well, that's a little different than your representation of Officer Ali's remarks. I don't recall specifically what Officer Ali said, but I know he did not say we have the suspects. In fact, I can turn to it quickly. Right, but I'm saying that's what the government's witness said. Isn't it? Let's see. We, Your Honor, let's rather- He showed us where the guys were, so we could kind of like point them out. When you're in the police car, did the officer say anything to you? Yeah. What did he say? He said that they found them, and they found our car. Your Honor, I hear what you're saying, and it may have been a problem, but the female victims, when they called 911, their description of the defendants were pretty accurate. I mean, they gave detailed descriptions- Oh, I agree, I think you're being real- To decide their height, their weight, what they were wearing, so I think- Okay, don't, I apologize if I'm interrupting you, but the point I'm making is, I think you'd be in a lot of trouble if you didn't have those precise descriptions. I do not disagree with Your Honor. But I think the suggestiveness of the show-up is negated by the fact that a few minutes earlier, no more than 20 minutes earlier, the females provided detailed descriptions of the suspects to the police. In fact, the testimony of one of the officers was that he knew he was looking for somebody wearing a striped shirt.  He sees Mr. Franklin, who's disheveled and sweating, wearing a striped shirt. So I think that helps eliminate and negate some of the suggestive nature of the show-up identification in this case. So if the panel- And the two weren't together, I'm sorry, I'm reminded these were two separate procedures with the two suspects. They were, because they were found in different locations on the block. That's correct, Your Honor. So if the panel doesn't have any further questions, I submit that the jury's verdict supported by substantial evidence and that the district court's ruling, denial of the motions to suppress should be affirmed, and that on the ineffective assistance claim, that that should be allowed to progress through the district court through a 2255 motion. Thank you, Your Honors. Thank you, Mr. Sifu. Do you have some additional time, Ms. Wicks? Your Honor, first, to respond to, I may have not articulated my point on my opening argument, but I don't believe that the gun was pointed, for the first incident, I don't believe that the gun actually touched the complainant. Looking back again, it's actually page 41 of the direct, which is in the supplemental joint appendix at 255. Mr. Gallin-Thomas testified that the man had the gun pointing at my ribs, and that he saw, he also then goes on to talk about how when the gun was pointed at his ribs, he was able to see it. So, and he actually describes the nose of the gun. So, I think from, there's no testimony that it was touching him. I think the testimony is that it was pointing at him, and I just wanted to correct, because I thought Judge Keenan had a question about that, and I wanted to clarify our position that the first complainant was not touched with the gun. What difference does that make? I think it does make a difference in terms of under the case law, if it's just the brandishing of a gun, there has to be something in addition to that, and so if there isn't a touching or some sort of other assaultive behavior or something that makes out the intent of the defendant, it's insufficient. Well, if you look, I'm sorry, if you look at page 256, bottom of the question is, now once the gun was in your rib cage, what happened next? Right, which is a leading question. Yeah, unobjected to, unobjected to. I agree. But I think it assumes a fact in evidence, and his answer does not say, does not agree with that assertion necessarily. Well, so is your point really, does your point actually hinge on whether the gun was touching the skin of the victim? Or was instead an inch and a half away from the rib cage? What is your point? I think it would be farther than an inch and a half if he's describing the nose of the gun, the person seated behind him. So if he's turning and he can see the nose of the gun, it's not just an inch and a half away from him, if it's pointed at his rib cage. So I just wanted to take issue with that. I agree it's a minor point, Your Honor, but I think when you're looking at, the facts clearly matter in the prior case law in terms of finding what occurred. And I think the facts- You're not suggesting the gun has to touch the victim in order- I'm not suggesting that it has to. I'm suggesting that the case law says if it does, that that is certainly indicative of the intent. And if it's not, that there has to be something in addition. That an inch and a half difference between the muzzle? If you look at the case law, I think the touching of the gun to the victim is highly indicative under the case law. And if there's not a touching, then I'm not suggesting that there has to be some sort of other assault, sort of aggravating circumstance, and that's not- And what about reading the victim's name and address from his identification? I don't think that that says, we're going to kill you. I'm not saying- You don't think it says that? I'm not saying that- What does it say? What do you think was being communicated at that moment to the victim? Don't call the police. I mean, he tells me- Don't call the police? Don't tell the police about that. We know where you live. It's not, we're killing you to get your gun. And what are we going to do with this knowledge of where you live? I think that it's a threat. I mean, it's a lot- Well, that's all the Supreme Court said is needed, right? No, but it's not a threat of bodily injury if you don't give up your car. There's not even a suggestion that you're- I think if you look at what is said, there's not even a suggestion of that you're not going to give us the car. It's basically talking about, after you give us your car, basically, A, don't call the police because we know where you live, and the claim, credible or not, that we're going to bring the car back. But the point is, it's not going towards, if you don't give us the car, we're going to do something to you. I don't think it suggests that. And, Your Honor, for the issue that the government council talks about in terms of the suppression issue, I think Judge Keenan correctly points out what the complainant said. I think it's, the officers have one version of what was said to the complainants, but I think all of the complainants agree that they were told, we got your car, and we got the guys. And that is what's told to them before they get there. If one were to assume it was suggestive, and maybe even assume, if you wanted to, that it's unnecessarily suggestive, is there any, can you point to anything to question the reliability of the identification under the circumstance? Well, because the 911 call is the girls talking over each other. So you, in terms of independent identifications by each complainant, I think there is an issue here. They're sort of all, the 911 call is them talking. I'm sorry, I'm not following your answer. My question is, what can you point to that reasonably calls into question under the circumstances of the crash, the apprehension, etc.? Because they all hear each other talking. They overhear the 911 call where someone is describing what they saw. Their versions of what occurred are very different from each other. And so if the fact that you have, and that's not the police fault in terms of them listening to what is said in the 911 call. But then you have it that they're all basically then told, we have your car, we have the guys, they're brought there. Which was true, right? They had their car. The police had their car. Right, and they see their car before they're shown the guy. And why doesn't that significantly bolster the reliability of the identification? That's what I'm asking you. Because- How does that help you? Suppose the guys have been sitting- I don't think it bolsters the reliability. It doesn't? No, I think- What if they've been sitting in the car? What if they've been sitting in the car when the victims were pulled up next to them? Well, I mean, we don't have that, I guess. Well, we have the next best thing, right? We have two people apprehended a few yards away from the crash of the car. Right, but in terms of- Running in opposite directions. In terms of the amount of time that has passed, and the amount of time that has passed since the car has crashed, you don't know where Mr. Franklin has come from. You don't, it's not, it's a very large area, and there's no evidence that it was contained, really officially contained. And what do you say about the shirt? I mean, you weren't at trial, I understand that. Have you seen the shirt? Have you seen the shirt? I have not seen the shirt. You haven't seen the shirt. It's a orange striped shirt. Send her a photograph of the shirt, please, Mr. Silver. It's a orange striped shirt. I'm not saying that that, that's not a white t-shirt. It's not the most generic of shirts, but it's in, I don't know how many people in Baltimore wear white striped shirts, but it's- And what about the cooperator's testimony? Does that bear on the reliability of the identification? Well, it doesn't bear on the reliability of the identification because that wasn't. I mean, that's- An accomplice saying, yeah, he was there, he was the other guy. That doesn't go to the reliability of the identification? Not in terms of what's before the court pre-trial, no. I mean, that wasn't before the court. I understand that. We're talking about the reliability of the in-court identification. Well, I, I, no, I think we're talking about the reliability of the, first we're talking about the reliability of the out-of-court identification. But does that matter, given the evidence of the in-court identification? Well, it, it does matter because if- How does it matter? If, because if the court finds that the out-of-court one is unreliable, then, then that, the, the court then can consider whether or not an in-court identification could be reliable if you keep the out-of-court one out. And I'm asking you, what can you point to that renders the in-court identification unreliable, given the totality of the circumstance? I mean, you didn't wanna, you didn't wanna bring this up. We understand that. You didn't bring it up in your opening argument, so. Well, I, I, because I think the issue, it's, it, the identifications are one issue, but the other issue is what's seized from Mr. Franklin. And he's clearly detained, and apparently been searched twice, because two different officers claim they find the ID on him. But, and that occurs before the identification procedure. Well, you don't question probable cause, do you? Probable cause to arrest? Yes. Yes. You do? You didn't do that in your brief? Yeah, we, we, we, we, below, even in the trial court, conceded that he could be stopped, but it's the probable cause to arrest. I don't think you briefed probable cause for arrest in your brief to this court. Am I right? I, I think I did, your honor. You think you did? Okay. I thought, I thought you only challenged the, the identification. No, well. Not the arrest. I'm challenging the identifications, because that goes into the calculus for the probable cause to arrest. Well, the arrest preceded the identification. They'd already been arrested. Well, right, but I'm saying, he had already been arrested, but in terms of the analysis pre-trial, the court can then consider. Because there's, there's other evidence taken as a result of his arrest after the identification, and that's his statement. So I think there's sort of two points that the court could point to in terms of his arrest, but I agree that he is under arrest before the identification. The only other issue I would comment on, your honor, is in terms of the ineffective claim. I agree with government counsel that it can be brought up in a 2255, but on this record- And that's our, that's our preferred practice. And I understand that, but on this record where Mr. Franklin did bring it up before sentencing, and, and, and I think the court didn't deal with this issue. I don't think, I agree with the government that the court can't find that his lawyer or lawyers were ineffective. I think the court can say that there's sufficient evidence here to remand it for hearing before the district court. That's what 2255 is for. Well, I, I mean, I think one way or the other it's gonna get there, but I think given that he raised it prior to conviction, that the appropriate, and the, and the court basically just didn't deal with it. I think the appropriate thing for this court to say is the court should deal with it. And if nothing else, remand it for hearing on that. Did you mean prior to conviction or prior to sentencing? I'm sorry? Did you mean prior to conviction or prior to sentencing? I'm sorry, prior to sentencing, yes. Okay, and so he, there's no under oath testimony. I agree, I, he, I mean, Mr. Franklin filed something pro se that was accepted by the clerk. I'm saying given the record where he's saying I didn't know, and the information in the record is actually inaccurate in terms of what he really was facing, I think that it, it is a colorable claim that the court should remand for hearing. Okay, thank you very much, Ms. Wicks. We appreciate the, you are court appointed in this case, and, and we just want to say how grateful we are for your availability and your willingness to accept appointment by the court to provide this important service. We'll come down and greet counsel and go immediately to our fourth and final case.
judges: Andre M. Davis, Barbara Milano Keenan, Henry F. Floyd